UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

JOHNNIE BUNTING,              :

                    :    01 Civ. 5716 (RJH)(RLE)

         Plaintiff,     :

                    :    **MEMORANDUM**

    - against -       :    **OPINION AND ORDER**

                    :

MICHAEL NAGY,             :

                    :

         Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Johnnie Bunting, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that defendant Lieutenant Michael Nagy violated his constitutional rights when he placed him in keeplock at the Green Haven Correctional Facility ("Green Haven") of the New York State Department of Correctional Services ("DOCS").  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331. Defendant Nagy has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that plaintiff has failed to state a claim for which relief may be granted, or in the alternative, for summary judgment on the basis of qualified immunity and/or, to the extent plaintiff sues defendant in his official capacity, on the basis that he is immune from suit under the Eleventh Amendment of the Constitution.  For the reasons set forth below, defendant's motion for summary judgment [34] is GRANTED.

## BACKGROUND

       The following background facts, unless otherwise indicated, are undisputed. Plaintiff Bunting is an inmate currently incarcerated at Wende Correctional Facility in

Alden, New York.  At all times relevant to his claim, plaintiff was incarcerated at Green

Haven in Stormville, New York.  (Bunting Dep. 33:17–21.)  Defendant Nagy is a retired

employee of DOCS.  (Nagy Aff. ¶ 1, Johnson Decl. Ex. B, Oct. 10, 2005.)  As of July 23,

1998, the date of the altercation resulting in the misbehavior report and disciplinary

hearing underlying this action, plaintiff was serving a disciplinary keeplock sentence for

a weapons charge to which he plead guilty on May 28, 1998.  (*See* Bunting Aff. ¶ 5;

Bunting Dep. 34:08–35:12, 37:13–15; Johnson Decl. Ex. C.)  Prior to the May 1998

weapons charge, plaintiff was in the general population, and not serving keeplock.

(Bunting Dep. 38:08–11.)  Defendant Nagy served as the hearing officer at the Tier III

Superintendent's hearing ("Tier III hearing") for plaintiff's May 1998 weapons charge.

(Bunting Aff. ¶ 5; Bunting Dep. 35:13–24; Johnson Decl. Ex. C.)  After pleading guilty,

Nagy sentenced plaintiff to a one-year sentence of keeplock confinement.[1]  (Bunting Aff.

¶ 5; Johnson Decl. Ex. C.)  Plaintiff sought discretionary review of the sentence; it was

later modified to six months keeplock and six months suspended with the possibility of

reinstatement.  (Bunting Aff. ¶ 6; Bunting Dep. 37:07–09.)  Therefore, from May 15,

1998[2] through November 15, 1998, plaintiff was serving the keeplock sentence

attributable to the weapons charge he pled guilty to on May 28, 1998.  (Def.'s Supp.

Mem. 9 n.6; Johnson Decl. Ex. C.)  Under governing regulations, time suspended from a

---

[1] Keeplock confinement is a form of administrative segregation in which an inmate is confined to his general population cell and denied participation in normal prison activities, as well as telephone and commissary privileges.  *Wright v. Coughlin*, 132 F.3d 133, 135 (2d Cir. 1998); *Holmes v. Grant*, 2006 WL 851753, at *2 n.2 (S.D.N.Y. Mar. 31, 2006).  Keeplock confinement is distinct from confinement in a special housing unit ("SHU"), which has been characterized as "a form of solitary imprisonment.  In addition to being separated from the general population, SHU inmates are limited in the prison issue items and personal belongings they may possess.  Also limited are shower and exercise privileges."  *Walker v. Bates*, 23 F.3d 652, 655 (2d Cir. 1994) (citation omitted).  In this case, none of the confinement complained of was served in SHU.

[2] Although plaintiff pleaded guilty to the weapons charge on May 28, 1998, the hearing disposition reflects that the sentence began to run as of May 15, 1998.  (Johnson Decl. Ex. C.)  Presumably May 15 is the date plaintiff was put into administrative segregation pending the disciplinary hearing that took place on May 28.

disciplinary sentence is subject to subsequent revocation if the inmate violates disciplinary rules within a certain amount of time after the time is suspended. *See* N.Y. Comp. Code R. & Reg. tit 7 §§ 253.7(a)(4) (Tier II), 254.7(a)(4) (Tier III). Plaintiff does not contest the constitutionality of this disciplinary hearing or his initial keeplock sentence.

On July 23, 1998, Officer LeClaire ("LeClaire") charged plaintiff with disobeying a direct order, making threats, and interference with a corrections officer. (Amended Compl. ¶ 1.) According to the misbehavior report, plaintiff refused LeClaire's order to remove a sheet hung to block the view into his cell and threatened to harm LeClaire if he removed the sheet himself. (Nagy Aff. Tab 1 at DEF 14.)

On July 24, 1998, plaintiff received an inmate misbehavior report relating to the prior day's altercation. (*Id.* ¶ 1; Nagy Aff. Tab 1 at DEF 14.) Within four days, on July 28, 1998, a Tier II disciplinary hearing commenced at Green Haven, with Nagy serving as the hearing officer. (Amended Compl. ¶ 2; Nagy Aff. Tab 1 at DEF 12–13.) At the very start of the hearing, Nagy said to plaintiff "You look familiar…." (Hearing Transcript, Nagy Aff. Tab 2 ("Hr.") at DEF 19.) Plaintiff states that this statement was accompanied by a "knowing glare." (Bunting Aff. ¶ 8.) Defendant disputes that this statement was made with any "ulterior motive or reference to prior disciplinary proceedings." (Nagy Aff. ¶ 18.) Defendant states that if plaintiff looked familiar, it must have been because he had seen him during the course of performing his duties as a watch commander and corrections officer. (*Id.*)

As his defense, plaintiff argued that he was the victim of mistaken identity because he was at the hospital at the time of the July 23 incident involving LeClaire.

(Amended Compl. ¶¶ 3–4; Hr. at DEF 30–31.)  The altercation underlying the

misbehavior report occurred at approximately 5:50 p.m. on July 23, 1998.  (Nagy Aff.

Tab 1 at DEF 14.)  According to the log book for that day, plaintiff was escorted to the

facility hospital by Officer Stetz at 5:35 p.m. for an emergency sick call.  (Hr. at DEF 21;

Johnson Decl. Ex. D.)  Plaintiff testified that it takes about one minute to walk from his

cell to the facility hospital.  (Bunting Dep. 41:09–14.)  According to the "ambulatory

health record," plaintiff was able to see the nurse at the facility hospital at 5:40 p.m.

(Johnson Decl. Ex. E.)  He complained of swelling and showed the nurse a small

abrasion, approximately the size of a pencil point.  (*Id.*)  The nurse told plaintiff to wash

his hands with soap and water.  (*Id.*)  There is no documentation to indicate the time

plaintiff returned to his cell from the facility hospital.  (Hr. at DEF 22.)  Notwithstanding

plaintiff's argument, defendant Nagy found there was sufficient evidence to establish that

plaintiff had returned to his cell in time to participate in the altercation with LeClaire.

(Nagy Aff. ¶ 16.)

     Nagy also received testimony from two inmate-witnesses plaintiff identified to

support his claim of mistaken identity.  (Bunting Aff. ¶ 10; Bunting Dep. 47:04–11;

91:11–14.)  According to plaintiff, the inmate-witnesses testified that plaintiff was not in

his cell at the time the alleged altercation with LeClaire occurred.  (Bunting Dep. 91:12–

15.)  The recordings of the inmate-witnesses' testimony were, perhaps mistakenly, not

transcribed, and are therefore not part of the record before the Court.  (*See* Ryan Aff. ¶ 3,

Johnson Decl. Ex. F.)[3]  In any event, Nagy found the inmate-witnesses' testimony was

not credible.  (Nagy Aff. ¶ 17.)

---

[3] All tape recording of the hearing have since been destroyed under DOCS record retention policy.  (Ryan
Aff. ¶ 3.)  Plaintiff has not posited that the absence of some portion of the record prejudices him in any

Plaintiff also requested the testimony of the witnessing officer who signed LeClaire's misbehavior report.  (Hr. at DEF 23–25.)  The witnessing officer's identity was undeterminable from the misbehavior report because the officer's signature was illegible.  (*Id*.)  Because the witnessing officer was not ascertained as of August 6, 1998—which, under the applicable regulations, was the date by which a disposition ought to have been reached—Nagy submitted a request for an extension to DOCS's Central Disciplinary Office in Albany ("Albany Office").  (Nagy Aff. ¶ 9; Nagy Aff. Tab 1 at DEF 16–17.)  An extension was granted to complete the disposition by August 8, 1998. (*Id.* at DEF 17.)  On August 8, 1998, Nagy requested a second extension through August 13, 1998 due to difficulty identifying the proper witness; it appeared the proper witness was unavailable and therefore unable to appear absent an extension.  (*Id.*)  The second application for an extension was made on a Saturday, so the Sunday August 9, 1998 hearing was conducted under the assumption that the Albany Office would grant the extension on Monday.  (*See* Hr. at DEF 29–30.)  Plaintiff formally objected to the timeliness of the hearing.  (*Id.*)  On August 10, 1998, the Albany Office granted the extension to August 13, 1998, rendering the August 9, 1998 disposition date proper. (Nagy Aff. ¶ 11; Nagy Aff. Tab 1 at DEF 17.)

Nagy spoke with four corrections officers, including LeClaire, in an attempt to determine the witnessing officer's identity.  (Nagy Aff. ¶ 13; *see also* Nagy Aff. Tab 1 at DEF 12.)  At some point Nagy suggested that perhaps the signature might belong to Officer Stetz, and plaintiff accordingly requested that Stetz testify at the hearing. (Bunting Dep. 73:13–75:18)  Nagy spoke with Stetz off the record and outside plaintiff's

---

way, nor has he alleged that any statements made on the record at the hearing but excluded from the transcript are material to the claims at issue here.

presence; Stetz told Nagy that he had no knowledge of the altercation between plaintiff and LeClaire.  (Nagy Aff. ¶ 13; Hr. at DEF 25.)  Nagy prepared the requisite paperwork, Form 2176, documenting his conversation with Stetz.  (Nagy Aff. ¶ 19.)  Plaintiff signed Form 2176, which indicated that Nagy was denying plaintiff's request that Stetz testify at the Tier II hearing on the ground that Stetz had "no knowledge of [the] incident."  (Nagy Aff. Tab 1 at DEF 15; Bunting Aff. ¶ 12; Nagy Aff. ¶ 19; Hr. at DEF 25.)  Plaintiff now contests the propriety of defendant's off-the-record conversation with Stetz, though he does not claim that Stetz in fact witnessed the July 23, 1998 incident with LeClaire. (Bunting Aff. ¶¶ 11–13.)  Plaintiff instead argues that Stetz's testimony at the hearing would have been material because his defense centered around his 5:35 p.m. visit to the facility hospital, and Stetz was the officer who escorted him there.  (Pl.'s Opp'n Mem. 8.) However, at no time prior to the filing of his opposition to defendant's motion for summary judgment did plaintiff ever claim that Stetz's testimony was sought with respect to the hospital visit.  In fact, plaintiff sought Stetz's testimony only to the extent he believed, due to Nagy's own suggestion, that Stetz might be the reviewing officer.  (*See generally* Hr.; Bunting Dep. 75:02–18; 76:03–18; 76:18–77:05.)

Ultimately Officer McGrath was identified as the witnessing officer, and plaintiff was given the opportunity to question him on the final day of his disciplinary hearing, August 9, 1998.  (Hr. at DEF 26–29.)  McGrath testified that he remembered signing the July 23, 1998 misbehavior report, and that he saw and heard plaintiff cursing at and threatening LeClaire.  (*Id.* at DEF 26, 29.)

After a brief adjournment, the hearing reconvened and Nagy found plaintiff guilty of the charges against him and sentenced him to thirty days of keeplock confinement.

(Amended Compl. ¶ 11; Hr. at DEF 32; Nagy Aff. Tab 1 at DEF 11.)  Nagy also reinstated ninety-one days from the suspended portion of plaintiff's Tier III keeplock sentence.  (Hr. at DEF 32); *see also* 7 N.Y. Comp Code R. & Reg. tit. 7 § 253.7(a)(4) (allowing suspension and reinstatement of time at Tier II disciplinary hearing); *id.* § 254.7(a)(4) (allowing same at Tier III superintendent's hearing).  According to the disposition, the ninety-one days of reinstated suspended time was scheduled to start running on November 15, 1998, the date the May 1998 weapons charge six-month sentence was complete.  (Nagy Aff. Tab 1 at DEF 11.)  The thirty-day keeplock sentence for the charges in the July 23 misbehavior report was scheduled to begin running on February 13, 1999.  (*Id.*)  Thus, plaintiff was sentenced to serve 121 days keeplock as a result of Nagy's findings in the Tier II hearing.  (Amended Compl. ¶ 9; Nagy Aff. ¶¶ 20, 22.)

Nagy prepared a written statement containing the following "reasons for disposition":  "Inmate Bunting's previous poor disciplinary record considered.  In this instance, Inmate Bunting disobeyed staff orders, interfered with an employee's duties, and threatened staff.  This misbehavior will not be tolerated!  This disposition is intended to serve as a deterrent to this and other inmates in the future."  (*See* Nagy Aff. Tab 1 at DEF 13.)  Thereafter, plaintiff appealed Nagy's sentence and on August 13, 1998, the Acting Deputy Superintendent of Security at Green Haven affirmed plaintiff's sentence. (*Id.* at DEF 8.)  Plaintiff served the full 121-day sentence in addition to the six months he was already serving for the May 1998 weapons charge.  Plaintiff claims he served a total of 335 days keeplock confinement.  (Bunting Aff. ¶ 20.)

Plaintiff filed an Article 78 petition in New York State Supreme Court on or about October 9, 1998, challenging the Tier II hearing and his subsequent sentence. (Am. Compl. ¶ 11; Ryan Aff. ¶ 2; Ryan Aff. Tab 2.) Pursuant to plaintiff's claim, the court required Christopher Artuz, Superintendent at Green Haven and respondent, to submit a complete record of the Tier II hearing. (Ryan Aff. ¶ 3.) Artuz was unable to provide a complete record because there was insufficient documentation of the hearing. (*Id.*) As noted above, portions of the hearing were not transcribed and the recordings had been destroyed. (*Id.*) As a result, on April 21, 1999, prior to the disposition of the Article 78 proceeding, Robert Morton, the Acting Deputy Superintendent of Security at Green Haven, reversed and expunged the August 9, 1998 Tier II hearing for "administrative reasons." (Nagy Aff. Tab 1 at last page.) The New York Supreme Court subsequently dismissed plaintiff's Article 78 petition as moot. (Ryan Aff. Tab 1.) Plaintiff had completed the full length of the disciplinary sentence arising from the August 1998 sentence on March 15, 1999, before the misbehavior charges were expunged from his record. (*See* Bunting Aff. ¶ 20.)

As part of plaintiff's keeplock sentence, plaintiff's packages, commissary and telephone privileges were suspended during the 121-period of keeplock confinement. (Nagy Aff. Tab 1 at DEF 11, 13.) Plaintiff was also denied access to rehabilitating educational programs, work incentive programs, and wages due to inmates who are able to participate in such programs. (Amended Compl. ¶ 14.) While in keeplock plaintiff was allowed one hour of recreation each day, and three showers a week. (Bunting Dep. 103:12–17.) Plaintiff's access to law library materials was restricted to two items at a time. (*Id.* at 103:20–24.) Plaintiff also complains of stress, and that he once experienced

chest pains, but does not allege that there was ever an occasion where he had a medical problem and did not receive medical attention.  (*Id.* at 105:02–106:09.)

Although not alleged in his complaint, in his opposition to defendant's motion for summary judgment plaintiff complains that but for defendant's violation of his constitutional rights, plaintiff would not have been in keeplock on November 10, 1998, and therefore would not have been "involved in an incident which resulted in [his] sustaining a slash on [his] face at keeplock recreation."  (Bunting Aff. ¶ 18.)  Defendant disputes that the injury plaintiff sustained on November 10, 1998 is evidence of any hardship suffered by plaintiff while serving his keeplock sentence.  Defendant proffers, in support of his position, the disciplinary package associated with the November 10 altercation.  (Johnson Decl. Ex. K, Nov. 21, 2005.)  On November 10, 1998, an inmate misbehavior report was prepared charging plaintiff with refusal to obey direct order, assault on inmate, and fighting.  (*Id.* at DEF 345.)  According to the reporting officer's description of the incident, there was a fight involving plaintiff and three other inmates in the keeplock recreation yard.  (*Id.*)  Despite two officers' attempts to order the inmates to break it up, the fight was not broken up until a response team arrived in the yard.  (*Id.*)  After the fight, plaintiff was taken to the clinic for medical evaluation due to a slash from a razor blade near his nose, but no weapon was ever recovered.  (*Id.* at DEF 345, 347–48.)  On November 23, 1998 a hearing was held and plaintiff pleaded guilty to the charges of fighting and refusing direct order, and not guilty to assault on inmate.  (*Id.* at DEF 342.)  The hearing officer admitted plaintiff's plea and found that the report did not substantiate the charge of assault on inmate.  (*Id.* at 343.)  Plaintiff was sentenced to sixty days of keeplock, effective March 16, 1999, with thirty days suspended and ninety days

deferred.  (*Id.* at DEF 341.)  Plaintiff was also deprived of package, commissary and telephone privileges for sixty days, effective March 29, 1999, with thirty days suspended and ninety days deferred.  (*Id.*)

On April 20, 2001, plaintiff filed this action under 42 U.S.C. § 1983 in the Southern District of New York claiming a violation of his constitutional rights under the Fourteenth Amendment.  (*See* Original Compl.)  By Order dated June 22, 2001, Judge Mukasey, to whom this action was previously assigned, directed plaintiff to file an amended complaint that detailed the conditions of his keeplock confinement and described how the disciplinary sanctions imposed an atypical and significant hardship. (*See* June 22, 2001 Order.)  Plaintiff submitted an amended complaint on June 30, 2001. (*See* Amended Compl.)  The case was then reassigned to the Hon. Sidney H. Stein. Thereafter, on September 4, 2002, Nagy filed a motion to dismiss plaintiff's amended complaint and for judgment on the pleadings pursuant to Rule 12(c).  Judge Stein denied defendant's motion to dismiss for the following reasons:  First, because the allegations that defendant denied him the right to call a witness on his own behalf stated a claim under 28 U.S.C. § 1983 for denial of procedural due process.  Second, because the due process right to call witnesses at disciplinary hearings is clearly defined, and therefore defendant was not entitled to qualified immunity.  Third, because plaintiff had alleged a keeplock confinement of 121 days, it was within the range that requires a district court to develop a factual record to determine whether the prisoner had suffered atypical and significant hardship for purposes of determining whether the prisoner has a liberty interest triggering procedural due process protections under *Sandin v. Conner*, 515 U.S. 472 (1995).  Finally, because the Court found that the Eleventh Amendment did not bar

plaintiff's claims, as there was nothing to suggest that the state is the real, substantial party in interest. *Bunting v. Nagy*, 01 Civ. 5716 (SHS), 2003 WL 21305339, *passim* (S.D.N.Y. June 6, 2003). The action has since been transferred again, and this Court now has before it defendant's motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48 (emphasis in original). If the moving party meets its burden, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex,* 477 U.S. at 322–23. Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a

genuine issue for trial.  *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).  "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).  "A fact is 'material' if it might affect the outcome of the suit under governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 248).

Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 321.  Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

The Court must consider plaintiff's pleading under a more lenient standard than "formal pleadings drafted by lawyers" because plaintiff is proceeding *pro se*.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  The Court reads a *pro se* party's supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  Nevertheless, proceeding *pro se* does not relieve plaintiff form the usual requirements of summary judgment.  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a *pro se* party's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (citation omitted)).

**DISCUSSION**

Plaintiff claims that during the Tier II hearing defendant Nagy deprived him of liberty without due process of law.  Defendant argues he is entitled to summary judgment because plaintiff cannot establish a due process claim under section 1983.

In order to prove a violation of due process, a plaintiff must first demonstrate that he was deprived of a constitutionally protected liberty or property interest.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 571 (1972); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir. 1996).  If such a deprivation occurred, the Court must then consider what process was due, and whether it was provided.  *See Matthews v. Eldridge*, 424 U.S. 319, 333–34 (1976); *Rivera v. Wohlrabm*, 232 F. Supp. 2d 117, 120–21 (S.D.N.Y. 2002) (citing *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)); *Rivera v. Cmty. Sch. Dist. Nine*, 145 F. Supp. 2d 302, 306 (S.D.N.Y. 2001) (citing *Narumanchi v. Bd. of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988)).

Defendant contends that the keeplock confinement plaintiff did not implicate a cognizable liberty interest, and that even if it did, plaintiff was provided sufficient due process.

### 1.  Liberty Interest

An inmate has a cognizable liberty interest under the Fourteenth Amendment when (1) prison discipline "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995), and (2) "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Arce v. Walker*, 139 F.3d 329, 334 (2d Cir. 1998).  To determine whether a disciplinary method imposes an

"atypical and significant hardship," a court must consider "'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v.*, 132 F.3d at 136). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted); *see also Taylor v. Rodriguez*, 238 F3d 188, 195 (2d Cir. 2001). Furthermore, whether the conditions of an inmate's "confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). The Second Circuit has cautioned that district courts determining "whether a liberty interest has been affected . . . are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusion[s] [are] based." *Kalwasinski v. Morse*, 210 F.3d 103, 106 (2d Cir. 1999) (internal citations omitted, bracketed language in original).

The Second Circuit has not established a bright-line rule as to how lengthy a term of disciplinary confinement (i.e., either "keeplock" or SHU confinement) will be considered atypical and significant. However, the outer contours of the amount of time that will implicate (or not) a protected liberty interest has been fairly established. On the lower end, "normal" SHU conditions, *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004)

(stating conditions in which prisoners "are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week" are considered "normal"), if imposed for a period of up to 101 days, generally do not constitute "atypical" conditions of confinement.  *Sealey*, 197 F.3d at 589; *see also Palmer*, 364 F.3d at 65.  By contrast, SHU confinement for a period of 305 days, without more, has been held to satisfy the *Sandin* standard of atypical and significant hardship.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").  A period of confinement between 101 and 305 days is considered to be an "intermediate duration" and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship. *Sealey*, 197 F.3d at 589; *see also Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) ("[W]e have characterized segregative sentences of 125 [to] 288 days as 'relatively long,' and thus necessitating 'specific articulation of . . . factual findings' before the district court could properly term the confinement atypical or insignificant." (internal citations omitted)); *Colon*, 215 F.3d at 232 (directing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days").  These parameters have been applied in this Circuit whether the disciplinary confinement complained of is served in SHU or keeplock.  *See, e.g.*, *Brooks v. DiFasi*, 112 F.3d 46, 48 (2d Cir. 1997) (finding district court failed to determine factual issues necessary for an assessment of whether keeplock confinement for 180 days constituted atypical and significant hardship under *Sandin*); *Harris v.*

*Russett*, 2006 WL 2239693, at *3 (S.D.N.Y. Aug. 4, 2006) (stating that "'normal' keeplock-type conditions" imposed for "period of up to 101 days" not considered atypical under Second Circuit law); *Muhammad v. Pico*, 2003 WL 21792158, at *15 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.) ("Because [plaintiff]'s 138 day [keeplock] confinement falls between 101 and 305 days, the Second Circuit requires a detailed factual analysis that the Court cannot make on the current summary judgment record.").

Plaintiff does not seriously argue the conditions of his keeplock confinement were abnormal or substantively atypical of ordinary conditions of keeplock confinement. Rather, plaintiff's position is that the duration of his confinement alone created a protected liberty interest. Originally plaintiff argued that the relevant period of confinement was the 121-day sentence attributable to Nagy's August 1998 sentence. Plaintiff now claims he served an aggregated sentence of 335 days in keeplock. Defendant does not appear to dispute the length of time plaintiff actually spent in keeplock, though he does contest the amount of time the Court should consider in considering whether a protected liberty interest is at stake here.

As discussed above, plaintiff pleaded guilty to a weapons charge at a Tier III hearing in May 1998. Nagy presided over the hearing and sentenced plaintiff to one-year of keeplock confinement, which began to run May 15, 1998. On appeal, the weapon charge sentence was later reduced to a six-month sentence; the other six months from the original sentence were suspended on the condition that plaintiff refrain from further disciplinary violations. Plaintiff was therefore confined from May 15, 1998 through November 15, 1998 for the weapons charge. On August 9, 1998, Nagy found plaintiff guilty of the misbehavior charges resulting in the Tier II hearing underlying this action.

Nagy sentenced plaintiff to another thirty days in keeplock confinement and, in addition, revoked ninety-one days of plaintiff's suspended Tier III sentence.  These 121 days ran from November 15, 1998 to March 15, 1999.  In addition, due to plaintiff's November 10, 1998 fighting infraction and resultant sentence, the Court assumes he served an additional sixty days of keeplock, effective March 16, 1999.[4]  Considering the May 1998 and August 1998 sentences together, the Court counts 305 days in keeplock confinement.  Adding to that the sixty-day sentence imposed November 1998, the Court counts 365 days of consecutive keeplock confinement.  The Court does not understand how plaintiff arrived at the 335 day figure, but will, for purposes of this motion, assume that plaintiff served a total of 335 consecutive days in keeplock confinement.

In determining the length of confinement to consider for purposes of identifying a protected liberty interest, the Second Circuit has, on more than one occasion, suggested that "'separate sentences should be aggregated for purposes of the *Sandin* inquiry; when they constitute a sustained period of confinement."  *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2000) (quoting *Sims*, 230 F.3d at 23–24); *see also Sealey*, 197 F.3d at 587–88 (requiring district court to aggregate sanctions that caused inmate to serve consecutive time in segregation); *Richardson v. Hillman*, 21 F. Supp. 2d 222, 229 (S.D.N.Y. 2001) ("Furthermore, the Second Circuit has expounded the responsibility for issuing officers to include the entire period in SHU that a prisoner was confined, if the officer extended the confinement period to constitute an atypical penalty." (citing *Sealey*)).  Defendant argues that aggregation of disciplinary sentences is only appropriate when each sentence is

---

[4] There is nothing on the record to confirm that plaintiff in fact served the full sixty days of this sentence (though likewise nothing to suggest that he did not).  It is unknown whether the thirty days suspended and ninety days deferred on the November 1998 sentence were ever instated, and the Court will assume it was not.

derived from a hearing where a due process violation occurred. However, the Court finds this argument inconsistent with the Second Circuit's suggestion in *Sealey* that "[w]herever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process." 197 F.3d at 587. The *Sealey* court further elaborated that "if conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally have to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days." *Id.* at 588 n.7.

The Court finds it is appropriate to consider plaintiff's May 1998 and August 1998 sentences in the aggregate. Considering these sentences in the aggregate, there can be no doubt that his confinement of 305 days satisfies the *Sandin* inquiry based on duration alone. *Colon*, 215 F.3d at 231 ("[W]herever the durational line is ultimately drawn, 305 days satisfies the standard."). Accordingly, plaintiff's sentences created a protected liberty interest that entitled him to procedural due process during his Tier II hearing.

### 2. Adequate Procedure

Because plaintiff has established that he was deprived of a cognizable liberty interest, the question is then whether Nagy denied him due process before imposing the sentence. *See Wright*, 132 F.3d at 136. Plaintiff argues that he was denied due process because (1) Nagy denied his request to call Officer Stetz as a witness, (2) the hearing was untimely, and (3) Nagy was a biased hearing officer who ignored plaintiff's evidence in

determining his guilt.  (Bunting Aff. ¶¶ 9, 12, 14, 16)  Nagy contends summary judgment should be granted since plaintiff had an opportunity to be heard "at a meaningful time and in a meaning manner."  *Mathews*, 424 U.S. at 333 (citation omitted).

While the due process protections afforded a prison inmate do not equate to "the full panoply of rights" due in a criminal prosecution, in *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), the Supreme Court discussed the level of process that an inmate is due before the imposition of good time credits or solitary confinement.  The Court explained that in order to comport with minimum due process requirements, the state must provide a prisoner with at least 24 hours' advance written notice of the charges against him and a written statement of the fact findings supporting the disposition and the reasons for the disciplinary action taken.  *See id.* at 563–64.  An inmate is also entitled to call witnesses and present documentary evidence in his defense, subject to legitimate safety and correctional goals of the institution.  *Id.* at 566.  The Supreme Court has also held that a hearing disposition must be supported by at least "some evidence."  *Superintendent v. Hill*, 472 U.S. 455, 455 (1985).  The Second Circuit has held that *Wolff*'s requirements extend to inmates facing SHU or keeplock confinement, and that an inmate has a right to a fair and impartial hearing officer.  *See Kalwasinski*, 201 F.3d at 108 (citing *McCann v. Coughlin*, 698 F.2d 112, 121–22 (2d Cir. 1983)); *Mays v. Mahoney*, 23 F.3d 660, 662 (2d Cir. 1994) (finding keeplock confinement to be punitive in nature, and therefore inquiry under *Wolff* was necessary).

a.  Right to Call Witnesses

"[P]rison authorities are given broad discretion to deny an inmate's request to call witnesses."  *Liner v. Goord*, 115 F. Supp. 2d 432, 436 (S.D.N.Y. 2000).  In exercising

that discretion, "it would be useful for [the fact finder] to state [the] reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Wolff*, 418 U.S. at 566.  Consistent with *Wolff*, the Second Circuit has held that an inmate has a right to call witnesses, and a hearing officer "may not refuse to interview an inmate's requested witness without assigning a valid reason." *Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (citing *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990) (per curiam)).  The burden is on the hearing officer to prove that the denial of witnesses is "logically related to preventing undue hazards to 'institutional safety or correctional goals,'" *Fox*, 893 F.2d at 478, or due to "irrelevance or lack of necessity," *Russell v. Selsky*, 35 F.3d 55, 58 (2d Cir. 1994) (quoting *Scott v. Kelly*, 962 F.2d 145, 146–47 (2d Cir. 1992) (internal quotation marks omitted)).  If the hearing officer "reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993).

Plaintiff claims his rights were violated when defendant spoke to Stetz off the record and decided, on the basis of that conversation, to deny plaintiff's request to call him as a witness.  Plaintiff provided Nagy with a witness request to determine if Stetz was the witnessing officer to signed LeClaire's inmate misbehavior report.  Plaintiff has acknowledged that he does not know whether Stetz was in the area of the July 23, 1998 incident, and that the only reason Stetz came to plaintiff's mind as a potential witness was because of Nagy's suggestion to him that the signature of the witnessing officer could possible be that of Stetz.  (Bunting Dep. 76:18–77:05.)  Nagy spoke with Stetz off the record to determine whether he was the witnessing officer that signed the LeClaire report.

(Hr. at DEF 24 ("[Nagy] asked [Stetz] if he cosigned [the report] and he said, no.  He said he wasn't there or anywhere near there so he's been ruled out as a witness."), 25; Nagy Aff. ¶ 19.)  Nagy filled out the required Form 2176 explaining that plaintiff's request to call Stetz is denied because "he has no knowledge of the incident."  (Nagy Aff. Tab 1 at DEF 15.)  During the hearing, when Nagy informed plaintiff that Stetz would not be appearing as a witness, plaintiff stated that he did not know who Stetz was.  (Hr. at DEF 24.)  Although plaintiff complained that Stetz's lack of knowledge of the incident was confirmed outside his presence (*id.* at DEF 25),[5] he signed Form 2176 (Nagy Aff. Tab 1 at DEF 15), and did not articulate any desire to call Stetz for any other reason.

Plaintiff now argues that Stetz should have been called to confirm the timing of his trip to the hospital facility.  (Bunting Aff. ¶ 13.)  The logbook does indicate that Stetz escorted plaintiff to the infirmary at 5:35 p.m., fifteen minutes prior to the altercation alleged in the misbehavior report.  (Johnson Decl. Ex. D; Bunting Aff. ¶ 11.)  Plaintiff argues that because the actual time of his return was material and crucial to the hearing, Nagy's denial of the witness without a security reason unjustifiably denied plaintiff's right to call a witness.  (Bunting Aff. ¶ 13.)  Plaintiff claims that although Stetz was initially mentioned as the possible identity of the witnessing officer, it was obvious that Nagy would have been informed that he was the also officer who escorted plaintiff to and from the hospital.  (*Id.*)  However, plaintiff's claims about Stetz's material testimony were asserted for the first time in plaintiff's opposition to defendant's motion for summary judgment.  Plaintiff did not raise this argument in the Amended Complaint; he

---

[5] Plaintiff has complained that Nagy's off-the-record conversation with Stetz to determine whether he was the witnessing officer was a violation of plaintiff's rights.  However, "[i]t is not a violation of due process at a disciplinary hear to take the testimony of a witness outside the presence of an inmate."  *Kalwasinski*, 201 F. 3d at 109.

also did not articulate a desire to interview Stetz in connection with the trip to the sick call when defendant denied plaintiff's request to call Stetz as a witness.  In fact, plaintiff testified at his deposition that he had no idea whether Stetz had knowledge of the incident or even whether Stetz had been at work on the day of the incident.  (*See* Bunting Dep. 73:12–**77**:21.)

In this case, defendant cannot be held responsible for plaintiff's failure to request Stetz's testimony with respect to the trip to the facility hospital.  While the record reflects that Stetz indeed escorted plaintiff to the infirmary 5:35 p.m., it equally reflects that at no time was Stetz's testimony sought in this regard.  Plaintiff never specifically requested to have the escorting officer called as a witness, only the witnessing officer who co-signed the misbehavior report.  Because defendant only considered whether to call Stetz in this capacity, and because defendant had a rational basis for concluding that his testimony would be irrelevant or unnecessary, the Court concludes that plaintiff's procedural due process right to call witnesses was not violated in this instance.  *See Kalwasinski*, 201 F.3d at 109 ("[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony."); *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991); *Scott*, 962 F.2d at 147.

b. <u>Right to a Fair and Impartial Hearing Officer</u>

An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer who does not prejudge the evidence, *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (quoting Patterson v. Coughlin, 905 F.2d 564, 569-70 (2d Cir.1990)), and there must be "some evidence to support the findings made in the disciplinary hearing," *Hill*, 472 U.S. at 457; *see also Patterson v. Coughlin*, 905 F.2d 564, 569–70 (2d Cir. 1990).

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000). Furthermore, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. Rather, the standard set forth in *Wolff*, 418 U.S. at 571, requires that the hearing officer not be so insufficiently impartial as to present a "hazard of arbitrary decisionmaking." In order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment." *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989).

Plaintiff claims that as a result of personal bias, Nagy ignored evidence and found plaintiff guilty of the violations. (Bunting Aff. ¶ 15.) In support of this claim, plaintiff states that Nagy started the Tier II hearing by saying "You look familiar," and giving plaintiff a "knowing glare." (*Id.* ¶ 8.) Defendant disputes that this statement reflects that he presided over the hearing with any bias or ulterior motive. (Nagy Aff. ¶ 18.) Plaintiff also alleges—for the first time in opposition to defendant's motion for summary judgment—that Nagy said, off the record, that he was going to find plaintiff guilty and going to impose a stiff penalty because he had the previous one modified. (Bunting Aff. ¶ 16.)

The Court has reviewed the transcript of the hearing and finds no evidence of bias. Plaintiff's conclusory allegations to the contrary are insufficient to raise a question of fact with respect to defendant's bias. With respect to Nagy's alleged off-the-record statement that he had prejudged plaintiff's case, it is notable that plaintiff's complaint and

subsequent deposition contain no mention of this purportedly highly material and egregious statement.  Indeed the absence of any allegation to this effect prior to plaintiff's opposition to summary judgment makes it difficult to credit.  *See Phipps v. Comprehensive Cmty. Dev. Corp.*, 00 Civ. 6063 (RJH), 2005 WL 287413, at *14 (S.D.N.Y. Feb. 4, 2005) ("While [plaintiff]'s . . . affidavit does not necessarily contradict her earlier deposition testimony, this belated insertion casts severe doubts as to whether [plaintiff] has merely attempted to create a sham issue of material fact through self-serving allegations contained in her affidavit." (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001))); *see also Hayes v. N.Y. City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969))).  This is especially so in light of a record that, in every other respect, indicates that plaintiff received a fair hearing by an impartial hearing officer.  Indeed, it is clear from the record that defendant made a substantial effort to locate the witnessing officer on plaintiff's behalf.  The record reveals that plaintiff received notice of the charges against him and was allowed to present evidence and call witnesses in his defense.  Defendant's finding of guilt is fully supported by "some evidence," in the form of the inmate disciplinary report and the testimony of LeClaire and McGrath.  Finally, defendant's imposition of thirty days plus the reinstatement of ninety-one days of suspended time is in accordance with DOCS regulations, *see* N.Y. Comp. Code R. & Reg. tit 7 §§ 253.7(a)(4) (Tier II), 254.7(a)(4) (Tier III), and does not raise any inference of bias.  *See Abdul-Matiyn v. N.Y.S. Dept. of Corr. Servs.*, 871 F. Supp. 1542, 1548–49 (N.D.N.Y. 1994) (finding that where plaintiff

had ample opportunity to present his defense, and where finding of guilt amply supported by the record, plaintiff's conclusory allegations of bias did not raise genuine issue of fact).  As such, the Court concludes that no reasonable trier of fact would find that plaintiff was deprived his right of a fair and impartial hearing officer.

c.    <u>Right to a Timely Hearing</u>

Lastly, plaintiff complains that the delay of the hearing was in contravention of the applicable state regulations.  The relevant New York State regulation provides the following:

> Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement . . . but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

N.Y. Comp. Code R. & Reg. tit. 7 § 251-5-1(a).  It further provides that "the disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee."  *Id.* at (b).  Contrary to plaintiff's argument, defendant was authorized to complete the disciplinary hearing outside the fourteen day limit, because he sought and was granted an extension of time through August 13, 1998.  Therefore, plaintiff cannot establish a violation of the state law procedural requirement or that his rights have been violated as a result of the timing of his hearing.

**3.  Defendant's Qualified Immunity and the Eleventh Amendment Arguments**

In light of the Court's determination on the due process issue, it need not address the questions of qualified immunity or sovereign immunity.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [34] is

granted, and plaintiff's amended complaint is dismissed in its entirety. The Clerk of the

Court may close the case.

SO ORDERED.

Dated: New York, New York
     September 27, 2006

Richard J. Holwell
United States District Judge